UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| VERONICA ASHLEY,<br>Plaintiff, | : | |
| v. | : | C.A. No. 05-031L |
| PARAMOUNT HOTEL GROUP, INC.; PARAMOUNT MANAGEMENT ASSOCIATES, LLC; FAIRFIELD INN BY MARRIOTT, Successors in Interest to Chalet Susse International, Inc.; JOHN DOE, Numbers 1 through 10,<br>Defendants. | : | |

**DEFENDANT'S RULE 12.1 STATEMENT OF UNDISPUTED FACTS**

Pursuant to Loc. R. 12.1, Defendants, Paramount Management Associates, LLC ("PMA") and Paramount Hotel Group, Inc. (collectively "Paramount" or "Defendants"), hereby provide their statement of undisputed facts in support of their motion for summary judgment.

1. Paramount Management Associates, LLC is a hotel management company. Affidavit of Phyllis Doloff at ¶ 2).[1]

2. Paramount Hotel Group, Inc. is the parent company of PMA. (Id. at ¶ 2).

3. Beginning in early 2000, all employees at the Warwick Susse Chalet were actually employees of PMA. They filled out Paramount applications, completed Paramount w-4 forms and received paychecks from Paramount. The Susse Chalet was simply a brand name and not a standalone corporation. (Id. at ¶ 2).

[1] Hereinafter, "Doloff Aff. at ¶ __". A true and accurate copy of this Affidavit and supporting exhibits are attached at Tab 1.

4. In 2001, Paramount converted the Susse Chalet property and "reflagged" it as a Fairfield Inn by Marriott. Again, Fairfield Inn by Marriott is a brand name and not a corporation. All employees continued to be employed by PMA. (Id. at ¶ 2).

5. Plaintiff, who is African American, completed an application to work for Paramount as a housekeeper at the Susse Chalet in June of 2000. (Deposition of Veronica Ashley, July 22, 2005, at pp. 58-59).[2] Dennis Bellucci, Executive Housekeeper, hired Plaintiff on the spot at the time that she filled out her application. (Id. at pp. 29, 59; Affidavit of Dennis Bellucci at ¶ 2)[3].

6. Mr. Bellucci is a gay, white male. (Id. at ¶ 5; Ashley Dep. Tr. at p. 81).

7. At the time of her hire, Mr. Bellucci knew Plaintiff was Black. He also knew that she had been convicted of a drug related crime, but decided to hire her and give her a chance. This could have served as a bar to her employment. (Bellucci Aff. at ¶ 3).

8. Plaintiff's duties included cleaning guest rooms. (Ashley Dep. Tr. at p. 30).

9. Throughout her employment, Plaintiff referred a number of African American friends, all of whom Mr. Bellucci hired. (Bellucci Aff. at ¶ 4; Ashley Dep. Tr. at p. 110).

10. Plaintiff worked for Paramount for nearly two years. Her supervisors periodically counseled and warned her regarding various performance issues. (Id. at pp. 88-9, 117-120; Bellucci Aff. at ¶¶ 6, 7).

11. In December of 2000, Plaintiff received a warning for insubordination because she swore at her supervisor, Mr. Bellucci. (Id. at ¶ 6; Ashley Dep. Tr. at p.117).

---

2 Hereinafter, "Ashley Dep. Tr. at p. __". A true and accurate copy of relevant pages cited are attached hereto at Tab 2.

3 Hereinafter, "Bellucci Aff. at ¶ __." A true and accurate copy of this Affidavit and supporting exhibits are attached at Tab 3.

12. In April of 2001, Plaintiff received a warning and a suspension for failing to change a blood stained pillow case in one of the rooms Mr. Bellucci had assigned her to clean. (Id. at pp. 117-120; Bellucci Aff. at ¶ 7).

13. Both of these incidents are documented; Plaintiff signed off on both warnings. (Id. at ¶¶ 6, 7; Ashley Dep. Tr. at pp. 117, 120-121).

14. In April of 2002, Defendant's general manager, Carlos Cerda, had to go into one of the rooms Plaintiff had cleaned after a guest had checked out because a guest had called indicating that they had left some personal property in the room. He discovered that Plaintiff had not changed the sheets in that room. Mr. Cerda asked Mr. Bellucci to monitor Plaintiff's work. Later that week, Mr. Bellucci "marked" the sheets of one of Plaintiff's rooms with a ball point pen. He then checked her room after she had completed cleaning it and saw the tell-tale ball point pen mark on the sheets showing that she had failed to change the bed linens after the guest checked out. (Bellucci Aff. at ¶ 10).

15. The next day, Mr. Bellucci and Mr. Cerda met with Plaintiff to discuss these violations of company policy. Although Plaintiff denied that she had failed to change the sheets, she could not refute the fact that Mr. Bellucci said that he had marked the sheets which were found in the room she was assigned to clean. (Id. at ¶ 10).

16. Failing to change the sheets is a severe policy violation which constitutes a terminable offense. (Ashley Dep. Tr. at pp. 122, 133; Bellucci Aff. at ¶ 10; Doloff Aff. at ¶ 5).

17. Mr. Bellucci had utilized the pen marking procedure in the past with non-Black employees to determine whether they had been changing bed linens. (Bellucci Aff. at ¶ 11).

18. Based on her prior warnings and their investigation into her work, Messrs. Cerda and Bellucci terminated Plaintiff on April 11, 2002. (Id. at ¶ 12).

19. On November 13, 2002, Plaintiff filed a charge of discrimination under each against Fairfield Inn by Marriott with the Rhode Island Commission for Human Rights ("Commission"). A true and accurate copy of this charge is attached at Tab 4. (Ashley Dep. Tr. at p. 162).

20. Plaintiff did not file a charge against her actual employer, Paramount Management Associates, LLC and Paramount Hotel Group, Inc. (Doloff Aff. at ¶ 8).

21. When the Commission issued Plaintiff's right to sue notice on or about September 17, 2004, it did not name Paramount Management Associates, LLC ("PMA") and Paramount Hotel Group, Inc. on the notice and Plaintiff has not received a right to sue notice with respect to either of these entities. (Id. at ¶ 8).

22. Plaintiff testified that Mr. Bellucci discriminated against her because he did not like her, but she could offer no reason why he did not like her. (Ashley Dep. Tr. at p. 90).

23. As evidence of discrimination, Plaintiff testified that Mr. Bellucci called her "Aunt Jemina" 3-4 times during her employment and because Mr. Bellucci told her she resembled his friend John, who is apparently African American. Plaintiff testified that she never met or saw "John" and does not know if she resembles him, nor could she explain why this remark was racial. (Id. at pp. 105-107).

24. Plaintiff alleges that she complained after a non-employee black construction worker showed her his penis and propositioned her. (Id. at pp. 91-92). She complained about this in 2001. (Bellucci Aff. at ¶ 8).

25. Plaintiff did not tell her employer until three days following the incident, even though she reported to work the two days after the incident. (Ashley Dep. Tr. at p. 94).

26. A meeting was held between Plaintiff, Mr. Bellucci, her manager, Rick Cerda and the construction supervisor. The meeting lasted between 30 and 60 minutes. (Id. at p. 96).

27. During the meeting, her supervisors asked Plaintiff if she was sure this incident happened or if she was lying. (Id. at p. 93).

28. Rick Cerda gave Plaintiff several days off following the meeting. (Id. at p. 96).

29. Rick Cerda later informed Plaintiff that the construction worker was escorted off the property. Plaintiff did not see him ever again. (Id. at p. 95, 97).

30. Plaintiff asked Paramount to hire a security guard while she was working after the construction worker incident, but Paramount declined. (Id. at p. 97).

31. Plaintiff also claims that she asked to work on the first floor after the construction worker incident, but that this request was denied. (Id. at p. 101).

32. Plaintiff also claims that on numerous occasions, she reported to work, but that Mr. Bellucci sent her home saying there was no work to be done that day. She did not know if other non-black employees were similarly turned away for a lack of work. (Id. at pp. 151-2). Plaintiff also now complains that Mr. Bellucci would add hours onto her work day and that she had to work holidays that other non-Blacks got off, but she had no idea how scheduling was done at the hotel. (Id. at pp. 100, 102-4).

33. Plaintiff testified that she wore a headscarf while she worked. Related to this claim, Plaintiff testified that in early April of 2002, the hotel held a "mandatory" meeting in her absence and "everyone" voted that no headscarves should be worn at work. She also testified that she did not know about such a meeting, did not get in trouble for not attending the meeting and that Mr. Cerda was unaware that the alleged meeting took place. (Id. at pp. 138-139).

34. Plaintiff admits that Mr. Bellucci overheard her saying that "all priests are nothing but faggots" and that "they should be executed." (Id. at pp. 111-12).

35. During Plaintiff's employment, 12 (16.6%) of the approximately 72 employees employed at her hotel were Black/African American. Sixteen (22.2%) were Hispanic. Of the seven involuntary terminations at that hotel in 2002, two of the employees, including Plaintiff, were Black/African American; four were white and one was Hispanic. (Doloff Aff. at ¶ 6).

36. PMA maintains stringent equal employment opportunity policies which provide for equal employment opportunities for all employees and applicants without regard to race, sex, religion, color, age, marital status, sexual orientation, national origin or disability. (Id. at ¶ 7).

37. Plaintiff acknowledged receipt of Defendants' policies. (Ashley Dep. Tr. at p. 88).

PARAMOUNT HOTEL GROUP, INC
AND PARAMOUNT MANAGEMENT
ASSOCIATES, LLC

By their Attorneys,

Andrew B. Prescott (#3758)
Stacie Boeniger Collier (#6059)
Nixon Peabody LLP
One Citizens Plaza, Suite 500
Providence, RI 02903
Tel: (401) 454-1000
Fax: (401) 454-1030

Dated: November 28, 2005

CERTIFICATE OF SERVICE

I hereby certify that I caused to be sent by hand a copy of the within RULE 12.1 STATEMENT OF UNDISPUTED FACTS to Dawn Oliveri, Esq., 160 Plainfield Street, Providence, RI 02909 on this 28th day of November, 2005