UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

Veronica Ashley :
:
VS. : C.A. NO.: 05-031L
:
Paramount Hotel Group, Inc.; :
Paramount Management :
Associates, LLC; Fairfield :
Inn By Marriott, Successors :
In Interest to Chalet Susse :
International, Inc.; John :
Doe, Numbers 1 through 10 :

DEPOSITION OF VERONICA ASHLEY, the Plaintiff for the above-entitled cause, taken on behalf of the Defendants, before Elizabeth Greeley, Notary Public, in and for the State of Rhode Island, at the offices of Peabody Nixon, LLC, Citizens Plaza, Providence, Rhode Island, on July 22, 2005 at 10:00 A.M.

PRESENT:
FOR THE PLAINTIFF........LAW OFFICE OF DAWN OLIVERI
BY: DAWN OLIVERI, ESQUIRE

FOR THE DEFENDANTS.......NIXON PEABODY, LLC
BY: STACIE COLLIER, ESQUIRE
ALSO PRESENT: PHYLLIS DOLOFF, PARAMOUNT HOTEL GROUP

ALLIED COURT REPORTERS
115 PHENIX AVENUE
CRANSTON, RI 02920

can follow each other. It's just for the record.
(PRIOR QUESTION AND ANSWER READ BACK)
Q. Are you ready, Ms. Ashley?
A. Yes, ma'am.
Q. I'm just trying to get the time line straight. That is, you testified that you moved to Lisbon Street in November of 2001 and then you had testified that you moved to Mobile, Alabama, in June of 2002 --
A. I did it again.
Q. -- which would be about eight months. Does that sound accurate to you?
A. No. It really doesn't.
MS. OLIVERI: You can always say you don't remember.
A. I don't remember. That's why I was saying I can get you all them documents.
Q. Was Mr. Ashley contributing to the rent, James Ashley?
A. Yes. He paid half.
Q. Was the $550 that you were paying the total rent?
A. Yes.
Q. You each paid $225?
A. Yes.
Q. When Victoria Ashley lived there, did she also contribute to the rent?



A. No.
Q. Where does James Ashley live today?
A. 72 Lisbon Street.
Q. Did anybody live with you and your grandmother at 808 Sussie Ansley Street in Mobile?
A. No.
Q. Prior to 72 Lisbon Street, where did you live?
A. 176 Holden.
Q. How long were you at 176 Holden during that period of time?
A. I don't remember.
Q. Do you know if it was more than a year?
A. Yes, it was more than a year.
Q. When did you start working for Paramount Hotel?
A. In 2000. It was the Susse Chalet.
Q. What do you mean it was the Susse Chalet?
A. That was the name, that was the name on the building at the time.
Q. How did you know that your employer was Paramount?
A. I didn't know. I'm not even going to lie to you.
Q. Okay.
A. I thought I was working for Susse Chalet. I thought I was working for Fairfield Inn by Marriott.



Q. Why do you think you were working for Fairfield Inn by Marriott?
A. That's what my badge said, Fairfield Marriott, Veronica, Providence. They had you put the state where you're born at. Everything in the hotel said Fairfield by Marriott. At the time when it was Susse Chalet, it said Susse Chalet.
Q. So these were two separate events. At some point it said Susse Chalet, and other times it said Fairfield Inn by Marriott?
A. Yes.
Q. When did it switch from Susse Chalet to Fairfield Inn?
MS. OLIVERI: To your knowledge.
MS. COLLIER: Everything is to your knowledge. You can assume that without your attorney telling you.
A. In February of 2002, I guess.
Q. It became Fairfield Inn?
A. Yes, by Marriott.
Q. What did your paycheck say in terms of --
A. On the top where it came from?
Q. Who issued your paychecks?
A. Paramount, I guess, New Jersey, something. I really don't remember the correct, the exact address.



Q. Was there ever a time that you received a check from anybody, other than Paramount, during your employment at either Susse Chalet or Fairfield Inn?
A. What do you mean by that?
Q. Did you receive any checks from an entity that said Fairfield Inn by Marriott?
A. I don't recall. I don't remember.
Q. Did you receive a check that had a Susse Chalet logo on it?
A. I don't remember.
Q. Who hired you in 2000?
A. The man who hired -- oh, Dennis. I can't even think of Dennis's last name. Dennis, he was a supervisor.
Q. Who was the general manager at that time?
THE WITNESS: When it was Fairfield by Marriott?
MS. COLLIER: When you were hired.
A. Oh, I forgot his name. I forgot his name. When it was the Susse Chalet, he had left. He had, they were bringing in so many different people. I don't know what was going on, but like every month I was looking up, it wasn't really a specific general manager at the time.
Q. Was Dennis your supervisor throughout your

Q. Both. Do you see that?
A. Yes.
Q. It's two different handwritings, correct?
A. Yes.
Q. Do you know whose handwriting is on the top?
A. Yes.
Q. Whose?
A. Dennis.
Q. Your supervisor?
A. Yes.
Q. Do you see the handwriting that is on the bottom?
A. Yes.
Q. Whose handwriting is that?
A. Mine.
Q. Do you see where it says today's date, 6/7/2000?
A. Yes.
Q. Does that help refresh your recollection about when you applied for employment with Paramount Hotel Group?
A. No.
Q. You don't remember if it was in June of 2000?
A. Well, that's what's wrote there, I guess. It's my handwriting.
Q. Let me ask you this: Do you have any reason to believe that that date is wrong?



A. No.
Q. Where did you go to fill out the application?
A. There at the hotel.
Q. Were you immediately interviewed?
A. Yes.
Q. Who interviewed you?
A. Dennis.
Q. Did anyone else interview you?
A. No.
Q. Was anyone else with you when you applied?
A. No.
Q. Did he offer you the job on the spot?
A. Yes, after he got through doing the interviewing.
Q. Did you know anybody else who worked at Paramount?
A. Yes.
Q. Before you started working there?
A. I didn't know she worked there. When I got hired, I found out she worked there.
Q. Who was that?
A. Nina Hazard.
Q. Was she a housekeeper?
A. Yes, she was.
Q. Taking a look at the second page, at the very top



of the second page there is a note. I believe it says Friday, 7.00; do you see that?
A. Yes.
Q. Is that your handwriting?
A. No.
Q. Do you know what that means?
A. No.
Q. Now, the rest of the handwriting on this page, does that look familiar?
A. Yes.
Q. That is your handwriting?
A. Yes.
Q. Looking at the fourth page of the application at the bottom of the page, is that your signature?
A. Yes, it is.
Q. Again, the date is 6/7/2000?
A. Yes, ma'am.
Q. Going back to the second page where it says education record, name of school --
A. Yes.
Q. You went to Mt. Pleasant High School?
A. Yes, I did.
Q. You completed the eleventh grade?
A. I didn't complete it. I quit in the eleventh, stopped in the eleventh. Completed the



tenth.
Q. Have you received your GED since then?
A. No, I have not.
Q. At the time of this application you were living at 176 Holden Street?
A. I don't recall.
Q. Take a look at the second page. Does that help refresh your recollection about where you were living at the time of this application?
A. Yes, but I don't recall if I was staying. I stayed in between 176 and my sister's, you know what I'm saying? You know, I stayed at my sister's for two weeks.
Q. I don't know what you're saying.
A. Well, I lived with my sister for two weeks. I'd go back home and stay there with, you know what I mean, my grandmother was there at the time.
Q. Where was your sister living?
A. 10 West Drive.
Q. Which sister was this?
A. Nadia Horton.
Q. Did you pay rent at 10 West Drive?
A. Yes, I gave my sister board money.
Q. How much?
A. $50.

Page 86

A. The Providence Narcotics Task Force.
Q. Do you know why they would have done that?
A. I guess they didn't like me.
Q. Did you serve time for that?
A. No.
Q. Any other arrests or convictions?
A. No.
Q. So is it fair to say that you haven't had any other arrests or convictions since you served your sentence at the ACI?
A. Yes, that's fair. That part of my life is done.
Q. Sure. You disclosed that on this application?
A. Did I disclose it on the application?
Q. Sure. Do you know what I mean by that?
A. No.
Q. Let me ask it another way. You told Paramount that you had been convicted?
A. Yes.
Q. They hired you anyway?
A. Yes. I mean, that would be discrimination. They couldn't do that, right? I could have put I wasn't.
Q. Well, looking at the bottom of this page, do you see where halfway down it says, "Please read carefully

Page 87

before signing"?
A. Yes.
Q. Did you read this before you signed it?
A. Yes.
Q. You understood that you were supposed to be truthful on your application, correct?
A. Yes. That's why I'm truthful. I'm telling the truth now. I'm not am embarrassed of what I did in my life. I did it. It's over with.
Q. Okay, terrific.
A. I'm old now. I'm too old to get in trouble. I haven't been in trouble in 11 years. I'm proud of myself.
MS. COLLIER: Good. Dawn, you wanted to take a break?
(LUNCH BREAK FROM 12:30 P.M. - 1:30 P.M.)
Q. Are you feeling okay; can you continue this afternoon?
A. Yes.
Q. I understand that you started to experience headaches during the lunch break; are you having headaches?
A. Yes.
Q. If at any time you want to take a break, just let me know. Okay?

Page 88

A. Yes, ma'am.
Q. You did not take any medication during lunch?
A. No, ma'am.
(DEFENDANTS' EXHIBIT D MARKED FOR ID)
Q. Take a look at Exhibit D, Ms. Ashley, and let me know when you've had a chance to review it. Have you had a chance to review what is marked as Exhibit D?
A. Yes.
Q. There is some handwriting in the middle of the page; do you recognize that?
A. Yes.
Q. Is that your signature?
A. Yes.
Q. Is that your printing?
A. Yes.
Q. Is this the receipt that you signed acknowledging getting Paramount's employee handbook?
A. Yes.
Q. While you were employed by Paramount, did you ever receive any discipline or counselling?
A. Counselling, no.
Q. Did you receive any discipline?
A. What do you mean by discipline?
Q. Were you ever warned for performance issues or misconduct?

Page 89

A. Yes.
Q. Were you ever suspended?
A. Yes, once.
Q. Was that with pay or without pay?
A. It was supposed to be without, but they still paid me.
Q. Oh, they did?
A. Yes.
Q. Did you tell anyone that you were paid?
A. Tom is the one who gave me my check.
Q. Who is Tom?
A. District manager.
Q. Did he know that you were supposed to be suspended for the week that the paycheck covered?
A. Yes, he was the one that handled it. He was one of, I guess one of the acting general managers, too, at the time. They had brung him in.
Q. When he handed you the check, did you say that you were supposed to be without pay for the week that the check covered?
A. No. He told me --
Q. What did he tell you?
A. That usually you're supposed to be suspended without pay, but I'm going to go ahead and give you your paycheck.

Page 90

Q. Did you tell Dennis this?
A. He was standing there. Rick was standing there. Tom was standing there and Carlos and Dennis. We were all in the office, and myself.
Q. Why do you believe that you were -- let me back up for a second. Do you believe you were discriminated against by Paramount?
A. Yes, I do.
Q. Why do you believe you were discriminated against?
A. I believe I was discriminated by Dennis. It was just an issue with me and him. He just didn't like me. I think Carlos upheld it and went along with whatever Dennis was saying to try and terminate me.
Q. Why do you believe that Dennis didn't like you?
A. I don't know. I don't know his reasons. You would have to ask him.
Q. Did you ever ask him if he liked you?
A. No, because I really did not care if he liked me or not. I was there to do a job, and that's what I did.
Q. Do you believe, why do you believe he had a problem with you?
A. I don't know. You're going to have to ask him that question.

Page 91

Q. Do you believe anybody else at Paramount discriminated against you besides Dennis?
A. Carlos, and his brother Rick.
Q. Why do you believe that Carlos discriminated against you?
A. Following along with whatever Dennis -- I mean, he was the general manager. Dennis was only a supervisor. He's over Dennis. I don't think -- he should have listened to both of our sides, not just be one-sided and listen to what Dennis was saying. There are two sides to every story.
Q. Why do you believe Rick discriminated against you?
A. Going along with -- you have to ask him that.
Q. Well, no, I'm asking you. You just testified that you thought Rick discriminated against you. I'm asking you why you believe he discriminated against you.
A. Going along with his brother and Dennis.
Q. In what way did Rick go along with Carlos to discriminate against you?
A. It was an incident that happened in the hotel. They had hired when they was, I guess switched from Susse Chalet to Fairfield Inn by Marriott, the building was under construction. The company they

Page 92

hired, it was a black man there. He had shut me in the room showing me his penis. They didn't do nothing about it. Me, I had the girl at the front desk -- I don't remember her name. I ended up calling the police. There is a police report. They never did anything about it, the company, nothing.
Q. Are you testifying that you complained about this incident involving --
A. Yes, I made a police --
Q. I have to finish. You complained about the incident involving the construction worker to Dennis?
A. Dennis and Rick. At the time Rick was general manager at that time.
Q. What did you tell them?
A. I told them what happened, the incident, what happened, how the guy came in. I was cleaning the room. He shut the door. The room darkened. It was real dark. I got nervous. I turned on a light. He was calling his penis Little Willie. I kept talking to him until I could, I got closer and closer to the door until I got the door open and I got out of there.
Q. When did this occur?
A. I can't recall dates at this point in time. There is a police report. There was a police report made. The police did come to the job, the officers.

Page 93

Q. When did you, did you go to the police before you went to Dennis and Rick?
A. No. I went to them first.
Q. How long after the incident with the construction worker in the room did you tell Rick?
A. Probably like three days later.
Q. Did you tell Dennis at the same time?
A. Yes. Dennis was off that day. When he came back from his day off, I told him. Dennis was informed.
Q. Dennis was what?
A. Informed.
Q. Did you tell Dennis at the same time you told Rick, were they together?
A. Yes -- no, no, no. That's what I'm saying. Dennis was off that day. I told Rick. Then when Dennis came back on the next day, then he was informed that morning.
Q. Did you inform Dennis the next day or did Rick?
A. I guess Rick did, and they called me down off the floor.
Q. What did they say?
A. Was I sure that he did that, am I lying. Those were the words out of their mouths. I asked them, "Why would I lie on something like that?" They

had his boss, the guy's boss. It was me, Dennis, Rick and the guy's boss inside the office. My cousin had come that day, James Ashley. He was very, very furious. I guess Rick was getting nervous. He thought my cousin wanted to go up, go upstairs, get the dude, fight the guy. They were holding off my cousin downstairs. It was a big thing.
Q. How come you waited three days to tell Dennis and Rick or to tell Rick?
A. I didn't know what to do, ma'am, at that time. I went straight home and told my cousin.
Q. Did you work the day after the incident with the construction worker?
A. Did I work with him?
Q. No, did you work the next day?
A. Yes.
Q. Did you work the day after that?
A. Yes.
Q. So there was a meeting between you, Dennis, Rick and the supervisor of the construction worker?
A. Yes.
Q. Was James Ashley at that meeting?
A. Yes.
Q. What was said during that meeting?
A. Was I lying. Am I sure he did these kinds of



things. Am I lying. I asked Rick, "Why would I make up something like that?" He said, "I don't know. I just need to get the truth. I don't know." I said, "What are you going to do about it?" His boss was saying, "Oh, she's lying, she's lying." He was getting mad. He was a little short white guy with blonde hair. Then I guess a couple of days after that I told them I was going to quit. I wasn't going to come back unless something was done. They claimed they escorted him off the property. I don't know. I never seen the guy after that. I went through and filed charges and all that.
Q. Do you know what the name of the construction worker was?
A. His name was James something. I can't remember. I'm pretty sure they still have a report.
Q. What town did you file the police report with?
A. Cranston. Is it Warwick police, Cranston police?
MS. OLIVERI: Where is Fairfield Inn? Isn't it Cranston?
THE WITNESS: It's in Cranston. Cranston is a small city.
Q. Do you recall the name of the construction company?



A. No, I do not.
Q. How long was the meeting between you, Dennis, Rick and the construction supervisor and James Ashley?
A. About a half an hour to an hour.
Q. So you threatened to quit if they didn't do something?
A. And sue.
Q. And what?
A. And sue the construction company.
Q. Did you ever file a suit against the construction company?
A. No, I did not.
Q. Did you leave that day?
A. Yes. Rick said --
Q. Did Rick give you the rest of the day off?
A. Yes, he did.
Q. Did he pay you?
A. I don't remember.
Q. Did you take off the next day, or did you report to work?
A. I think I stayed off the next day.
Q. Were you paid?
A. I don't remember.
Q. How did you know to come back to work?
A. Through Rick calling, calling, and John.



Q. So Rick called you and told you to come back?
A. I would call or he would call, yes.
Q. How long do you think you were off before you returned to work?
A. Like two to three days.
Q. Did he tell you that the construction worker had been escorted off the property?
A. Yes.
Q. At that point did you feel comfortable returning to work?
A. No. I asked them could they hire a -- help me.
Q. She can't help you.
A. A security guard. My head is hurting.
Q. You asked your employer to hire a security guard?
A. Yes. See, the doors were supposed to be kept locked. I guess they were broke. You only can use a key to get in and out the doors. It wasn't programmed. People could walk in, in the hotel when they get ready. I felt threatened. The guy was real big, muscular. I thought he was going to come at, you know, if you press charges on somebody like that, I thought he was going to come back and do something to me.
Q. Did he?

Page 114

Q. Who else was in the room?
A. All the other housekeepers that were on that day.
Q. Do you remember who they were?
A. No.
Q. Any other reason that you believe you were discriminated against at Paramount?
A. No.
(DEFENDANTS' EXHIBIT E MARKED FOR ID)
Q. Just let me know when you've had a chance to review this. Okay, you've had a chance to review what has been marked as Exhibit E?
A. Ah-ha.
Q. Is that a yes?
A. Yes.
Q. Have you ever seen this before?
A. No.
Q. Does it appear to be a document called Progressive Counselling Report?
A. Yes.
Q. If you look at the very bottom of the page where it says in the left-hand corner employee/date, is that your signature?
A. Yes, but I don't remember seeing it. I don't even remember reading this.

Page 115

Q. Do you normally sign things that you don't read?
A. No.
Q. I mean, it looks like it was from December of 2000, correct?
A. Yes.
Q. It was almost five years ago?
A. Yes.
Q. Do you recall the incident that is described in this report? If you look about a third of the way down, I'll read to you what it looks like it says to me. Let me ask you this: I assume other than your signature the rest of this handwriting is not yours?
A. No.
Q. Do you know whose handwriting it is?
A. No, I do not.
Q. About a third of the way down it says, in typewritten it says, "Describe the action and its result/possible result." Do you see that?
A. Yes.
Q. I believe it says, "Veronica was insubordinate and used profanity towards her supervisor, was suspended by GM for two days." Do you see that?
A. Yes.
Q. Is that a yes?
A. Yes.

Page 116

Q. Do you recall being warned for being insubordinate in December of 2000?
A. Yes. Now it's coming back to me. This is the incident I'm telling you about with Tom. You asked me earlier on was I ever suspended. I said yes. You said without pay; I said no, with pay. That's when Tom explained to me, he said usually you're supposed to be suspended without pay, but I'm going to go ahead and give you one.
Q. Do you remember in what way your employer believed you had been insubordinate?
A. Yes. I remember, I think it was in Room 30 -- I do believe it was Room 301. He had came in. I wasn't done cleaning the room. He was proceeding to check the room. The room wasn't done. I just got into the room.
Q. Who is he, Dennis?
A. Dennis. I'm sorry.
Q. It's okay. Then what happened?
A. I said, "Dennis, what are you doing in the room? I haven't even finished the room. How are you checking the room? I haven't even finished." He said, "I'm the supervisor. I can do what I want to do." I went back to the cart, got my bathroom equipment, went in the bathroom. I was cleaning the

Page 117

bathroom. He kept calling me, calling me, calling me. I'm like, "Dennis, wait until I finish cleaning the room and you can check it. How are you going to check a room and I haven't finished cleaning the room?" "Come here now, come here now." I said, "Oh, what the hell." He blew up. He ran. "You're getting fired. I'm going to go to Rick and Tom." He runs out the door, gets on the elevator, goes downstairs. Rick comes back up saying Tom wants to see me. I left the cart there. I went downstairs. Tom asked me what was the problem. Dennis had wrote this up. He asked me did I swear. I said yes. He was like Veronica -- he was real nice, Tom. He said, "Veronica, I have to go on Dennis's word since you swore." I said I did swear. I said, "Tom, he kept calling me. I said, `Oh, what the hell.'" He said, "Since you said that, I'm going to have to suspend you for two days. I'm going to go ahead and suspend you. Usually I'd suspend you without pay, but I'm going to go ahead and give you your paycheck." I said all right. Now I remember signing the paper. I just cooperated and signed the paper.
Q. You were paid during that time that you were suspended?
A. Yes, I was. Tom is the district manager.

Q. Was he on site at the property?
A. Yes. He was in the process of, acting as GM at the time. I think that's when, that's when that general manager was fired for sexual harassment.
Q. Do you really think you were suspended for saying what the hell to your manager?
A. Yes.
(DEFENDANTS' EXHIBIT F MARKED FOR ID)
Q. Let me know when you finished reviewing this, okay, Ms. Ashley?
A. Yes. I'm ready.
Q. Does this appear to be a document, does Exhibit F appear to be a document titled Paramount Hotel Group Record of Disciplinary Discussion?
A. Yes.
Q. If you look towards the bottom of the page, is the second signature yours?
A. Yes.
Q. This appears to be dated April 5, 2001?
A. Yes.
Q. Is that a yes?
A. Yes. I'm sorry.
Q. Do you recall this disciplinary discussion?
A. Yes.
Q. What do you remember about this incident?



A. Dennis was off. He came. He said -- this is the general manager, this general manager, I guess.
MS. OLIVERI: The first signature?
A. Yes, the first signature. The guest had complained to him. Dennis actually didn't see the pillow cases or whatever. He said that to this general manager. This is the one who was fired for stealing at the time. I guess they showed it, the guest supposedly had showed it to the general manager. I guess Dennis that morning, I guess he brought it up to Dennis and Dennis wrote this up and brung it to me.
Q. Had you had any problems with this general manager?
A. No, not really.
Q. Did you have any reason to believe that the pillow cases did not have blood stains on them?
A. I did that room. I think that was the fourth floor. I think that was room, it was 420 something.
MS. OLIVERI: Does it say on here? Room 301.
A. This ain't even a room. This is on the third floor. The pillow case stain was supposed to be in Room 420. Why they got 301? I do remember this incident clearly. The room was 420. I don't know about this 301. That is the room that the blood stain



pillow had supposedly been in.
Q. Was what --
A. This, the blood-stained pillow case.
Q. Is it possible this discussion occurred in Room 301?
A. No.
Q. You didn't have disciplinary conversations in rooms that you were cleaning in?
A. No. Like I said, they hand me this the next day I came in. This wasn't even handed to me this day of this incident.
Q. Okay.
A. Why, I don't know. He supposedly had checked all the rooms, and checked -- Dennis, that's his job. Why this went undetected, I don't know. It was bogus from the start. I always figured this was bogus. That is my signature, and I did sign it. I wasn't suspended. It said I was suspended and I was not suspended. I continued on working.
Q. Do you know why you weren't suspended?
A. Because I guess they needed me. They didn't have nobody else to work at the time. They were very busy.
Q. I thought you said that Dennis wasn't working the day this happened?



A. He wasn't. I guess this general manager told him about the incident. This general manager made him write this up, you know what I mean, that morning when I came in. Then Dennis brung this to my attention.
Q. I'm just thinking you would have asked why it wouldn't have been detected?
A. I did, I did.
Q. You had suggested that the blood stain would have been detected when Dennis checked the rooms. I'm wondering if Dennis wasn't working, how could he have checked the rooms?
A. I made a mistake. I didn't mean to say that.
Q. That's okay. Do you think that it is a health violation for there there to be blood stains on pillow cases?
A. Yes, it is.
Q. You would understand why a guest would have a problem with that?
A. Yes. When I asked to see the pillow case, they could not produce the pillow case. I mean, if an incident happened like that, we have red bags, you dump sheets, towels, anything is supposed to go in the red bag. If there was an incident like this -- I'm not saying there was no blood stain on the pillow case. They wrote me up. I mean, wouldn't you have

kept the pillow case and shown it to me? "Well, the customer ain't lying. Here is the pillow case right here, Veronica." I asked them, "Where is the pillow case?" They said they washed it. Why would you wash it? Why wouldn't you keep it?
Q. Do you know whose handwriting this is?
A. No. I guess it's Dennis.
Q. Did you understand that linens were to be changed daily on all the beds?
A. Yes.
Q. And in the bathroom?
A. Yes.
Q. Who did you ask for the pillow case?
A. Dennis and this general manager.
Q. Did you understand that the pillow case had been washed the day before this report was given to you?
A. No, I didn't. I didn't know. I had punched out and went home and everything. Like I said, this was brought to my attention the next day when I came in and punched in to start my workday.
Q. Did Dennis check everybody's rooms to make sure that they had been properly cleaned?
A. No.
Q. He didn't?
A. No.



Q. Did you feel he just checked your rooms?
A. Yes. He checked a couple of other girls' rooms, but he didn't check everybody.
Q. Did he check every single room you cleaned?
A. Yes.
Q. Did you ask him why he did that?
A. A few times. We got in an argument over it. After he just kept on doing it, I didn't pay no attention to it. I let him. You know what I mean?
Q. Was it his job to make sure the room were clean?
A. All rooms in the hotel, not just mine.
Q. You testified, but he did check other girls' rooms?
A. Yes, about two other girls' rooms. He didn't check them all, two or one or two rooms.
Q. Did you follow Dennis around to know what he did all day?
A. No, I did not. On my floor, when he's up on my floor I can hear him go in and out the doors, check the rooms, checking my rooms.
Q. Did other people have rooms on those floors that he didn't check?
THE WITNESS: On my floor?
MS. COLLIER: Yes.
A. Sometimes I used to be the only one on that



floor.
Q. Right. So would you have any way of knowing what he was doing on other floors?
A. Yes, if I had rooms up there on that floor. Sometimes I have a majority of my rooms on the third floor. I may have like two to three rooms or four or five rooms up on the fourth floor, second floor. I would see him in the process of switching floors, but no, I did not follow Dennis around all day.
(DEFENDANTS' EXHIBIT G MARKED FOR ID)
Q. Have you had a chance to review the document marked as Exhibit G?
A. Yes.
Q. Does this appear to be a Paramount Hotel Group Record of Disciplinary Discussion?
A. Yes.
Q. Do you recognize the handwriting on this page?
A. No, not really, no.
Q. Have you ever seen this document before?
A. Yes.
Q. Can you describe the incident that the document discusses from your perspective?
A. No, because I don't know about the incident this document discusses. They claim, Dennis claimed that he, the day they terminated me, they made grounds



of terminating me on that day. It was a lie. This happened a whole week -- I was off my two days, came back, then they let me work. Then I come downstairs to punch out. I get all the way out into the parking lot into my car. They sent one of the girls at the front desk saying that Carlos wants to see me. I get out of my car, come back into the building, go into the office. I said, "Carlos, what's up?" Him and Dennis are standing there and they hand me this. I read it. They said it was terminating me. Terminating me for what? I don't even think Dennis was even on. They tried, Dennis said he marked the sheet. I asked him where is the sheet that he marked saying I didn't strip the beds. They could not produce the sheets. They could not produce the clothes, that clothes had been left in the room that a customer was complaining about it. They couldn't produce nothing.
Q. Were you working on the day when they claim the sheets weren't stripped?
A. Yes. This happened, like this incident that they got written up here, this was like last week. This week I come, this week I come to work. They let me work. On a Thursday they fired me.
Q. Are you testifying that they claimed this

Q. Was Carlos yelling at you?
A. No.
Q. I think you testified that you and Dennis were yelling at each other while Dennis was still in the room?
A. Yes.
Q. Did you swear at Dennis?
A. No, I don't recall.
Q. Did he swear at you?
A. I guess we both were swearing. That's why Carlos removed him and had him leave his office. Yes, he was swearing and I was, too. I do remember.
Q. What did you say to him?
A. I don't remember exactly what was said, because I was mad. You know, that's been since 2002. I know we was screaming back and forth at each other.
Q. Do you remember what he said to you, what Dennis said to you?
A. All right, I do remember a little bit. I said, "What do you think, I'm a black idiot?" I do remember saying that. I said, "You think I'm a black idiot, a black fool." I said, "You don't see that I know what you're trying to. You've been wanting to get rid of me." He was like, "What do you think, I'm a dumb white honky," all that. That's when Carlos was



like, "Ho, ho, ho, Dennis, leave. Dennis, leave." He was like, "Why I got to leave? Why I got to leave," like a big kid.
Q. Do you remember --
A. He walked out and slammed the door. I said, "Look how your supervisor is acting, Carlos, slamming doors. You don't even say nothing."
Q. What did Carlos say?
A. "I know, Veronica, I know, I know." He's a nervous like kind of guy.
Q. How long did the whole meeting take, including the part with you and Dennis?
A. I don't know. I mean, that day, someone is telling you you're fired, I'm mad. I don't know what the time was.
Q. I generally don't want you to guess, but in this case I'm going to tell you it's okay if you want to estimate. Do you think you were in that meeting for less than an hour?
A. I really can't say. I'm sorry.
Q. It's okay. Was anybody else outside the closed door of Carlos's office that you knew of?
A. The front desk clerk.
Q. What was his or her name?
A. I don't remember her name. Like I said, she



was about 5'2", blonde hair, come about right in the middle of her back.
Q. Okay. Was anybody else out there?
A. I don't recall. Carlos claims there were customers out there. I never looked, peaked out the door and saw. I know she was out there, because she was working the front desk.
Q. So after Carlos paid you, did you leave the meeting?
A. Yes, I left. I got off their premises, just left. Got in my car and left, went home.
Q. Did he escort you outside?
A. No, he did not.
Q. Did you say anything to the front desk clerk as you were leaving?
A. No. I don't recall. I wouldn't have no reason to say nothing to her.
Q. Did you say anything to anybody as you were leaving?
A. I don't recall that, no. I don't even think there was nobody out there when I left. Just her leaning up against the, the back of the computer.
Q. What time of day was it?
A. I had punched out. I don't remember. Maybe two.



Q. What was your typical workday, Ms. Ashley, what time did you punch in?
A. Nine.
Q. What time did you usually punch out?
A. It all depends how many rooms we got that day. I can't be certain.
Q. What time was check-in at the hotel?
THE WITNESS: Check in?
MS. COLLIER: Yes, for the guests.
A. I don't know what time it was. Check out was at eleven, I do believe. I can't remember.
Q. Were the rooms typically all clean by the time check-in occurred for the day?
A. No.
Q. No?
A. No.
Q. Did you receive any other disciplinary notices from your supervisors at Paramount, other than what we talked about today?
A. No, just these three that I remember. I don't remember no other ones.
Q. If you had failed to change the sheets, do you believe that would be grounds for termination for a housekeeper?
A. Yes, I do. Can I make a statement? Any

A. Yes.
Q. Is that a yes?
A. Yes.
Q. Do you understand this to be your charge of discrimination filed with the Rhode Island Commission for Human Rights?
A. Yes.
Q. If you look about two-thirds of the way down on Exhibit J there is a stamp that says Rhode Island Commission for Human Rights, November 13, 2002 received. Do you see that?
A. Yes.
Q. Underneath that there is, there are two signatures -- three signatures. Do you see those?
A. Yes, I can barely see them. I see mine.
Q. Are two of those signatures yours?
A. Yes.
Q. Did you understand that you were signing this under oath?
A. Yes.
Q. Is that a yes?
A. Under oath, they didn't have me raise my hand or nothing. I mean, when I got it signed by a Notary Public?
Q. Did you understand that you were telling the



truth when you completed this charge?
A. Ah-ha.
Q. Yes?
A. Yes.
Q. The date next to your signature on the left-hand side is November 7, 2002; is that correct?
A. Yes.
Q. Is that when you signed this document?
A. Yes. This one they sent to Alabama to have me sign.
Q. Do you know how this document came into being?
A. No. The Commission of Human Rights sent it to me.
Q. Did you provide them with any additional information besides the discrimination questionnaires that we already discussed?
A. Yes. They asked me to write out a complaint form. She has it. That is the only document I gave them.
Q. Did you have an attorney at the time that you signed this document?
A. No.
Q. Did this come to you unsigned but typed up, and then you were asked to sign the bottom of it?
A. This, yes.



Q. At that point you were living in Mobile, Alabama?
A. Yes.
Q. It's fair to say that the Respondent was the Fairfield Inn by Marriott? That's about a third of the way down.
A. Yes.
Q. Then looking in the body of the charge, you mention Carlos Serta in Paragraph 2. Do you see that?
A. Yes.
Q. He was the general manager of the Fairfield Inn by Marriott. Was that your understanding?
A. Yes.
Q. Is it fair to say that there is no mention of Dennis in this charge?
A. His name ain't in here.
Q. Number three of this charge of discrimination says, and I quote, "I believe I have been discriminated against on the basis of my race and color, black, in that my employer has subjected me to derogatory and demeaning treatment based on my race." Is there anything, did you mean anything else by this, other than what we talked about today?
A. Did I mean anything other?
Q. Yes. Have we talked about everything that you had in mind when you signed off on this charge?



A. Yes, basically.
Q. I'm quoting, "Shortly after the shift in management, my working conditions began to change." Do you see that?
A. Yes.
Q. What do you mean by "the shift in management"?
A. When it became Fairfield by Marriott from Susse Chalet.
Q. What did you understand happened as a result of the change over from Susse Chalet to Fairfield Inn?
A. It was just all types of stuff was going on. Like I said, all kinds of people, it was all kind of people coming, going. It was just, it was just unreal.
Q. You were working for the same company the whole time, correct?
A. I guess. I don't know. I was working for Susse Chalet and it switched over to Fairfield Inn by Marriott. That's all I know.
Q. In what way did your pay change as a result of the change over from Susse Chalet to Fairfield?
A. I don't think it did change.
Q. Did your uniform change?
A. Yes, the uniform changed.
Q. Did your employee handbook change?