UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

VERONICA ASHLEY                      )
                                     )
          Plaintiff,                 )
     v.                              )
                                     )          C.A. No. 05-031L
                                     )
PARAMOUNT HOTEL GROUP, INC.;         )
PARAMOUNT MANAGEMENT ASSOCIATES, LCC;)
FAIRFIELD INN BY MARRIOTT, Successors)
in Interest to Chalet Susse         )
International, Inc.; and             )
JOHN DOE, Numbers 1 through 10.      )
                                     )
          Defendants.                )

DECISION AND ORDER

Ronald R. Lagueux, Senior United States District Judge.

     This matter is before the Court on Defendants' Motion for
Summary Judgment under Rule 56 of the Federal Rules of Civil
Procedure and Rhode Island Local Rules 12 and 12.1.

     Plaintiff Veronica Ashley ("Plaintiff" or "Ashley") presents
this Court with a single count complaint against Defendants
Paramount Hotel Group, Inc.; Paramount Management Associates,
LLC; Fairfield Inn by Marriott, Successors in Interest to Chalet
Susse International, Inc. (collectively "Defendants").
Plaintiff, a former housekeeper at the Warwick, Rhode Island
Fairfield Inn by Marriott, also names John Doe, numbers one
through ten, as defendants; however, they have never been
identified so they will be disregarded.  Plaintiff claims

employment discrimination based on race and color under the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws § 28-5-1 *et seq.*   In this only count asserted against Defendants, Plaintiff makes a broad claim of racial discrimination, alleging that Defendants' practices failed to respect her right to "obtain and hold employment without being subjected to [various] acts of discrimination." *Compl.* ¶ 8.

After reviewing the facts presented in the record and considering the applicable law, this Court grants Defendants' Motion for Summary Judgment.   The reasoning that supports this decision follows.

## I. Standard of Review

When ruling on a motion for summary judgment, the court must look to the record and view all the facts and inferences therefrom in the light most favorable to the nonmoving party. Continental Casualty Co. v. Canadian Universal Ins. Co., 924 F.2d 370, 373 (1st Cir. 1991).   The law is clear that summary judgment must be granted if there are no disputed issues of material fact, and the moving party is entitled to judgment as a matter of law. A material fact is one which affects the lawsuit's outcome.   URI Cogeneration Partners L.P. v. Board of Governors for Higher Educ., 915 F. Supp. 1267, 1279 (D.R.I. 1996).   There is a genuine dispute over a material fact when the evidence is such that a reasonable jury could find for the nonmoving party.   Morrissey v.

2

Boston Five Cents Sav. Bank, 54 F.3d 27, 31 (1st Cir.
1995)(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248
(1986)).

To win summary judgment on a particular count of the
complaint, the moving party must show that "there is an absence
of evidence to support" the nonmoving party's claim.  Celotex
Corp. v. Catrett, 477 U.S. 317, 325 (1986).  Additionally, the
moving party must identify the portions of the record which it
believes demonstrate the absence of a genuine issue of material
fact. DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir.
1997)(citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986));
McConaghy v. Sequa Corp., 294 F. Supp. 2d 151, 159 (D.R.I. 2003).
In response, the nonmoving party cannot rest on its pleadings,
but must "set forth specific facts demonstrating that there is a
genuine issue for trial" as to the claim that is the subject of
the summary judgment motion.  Oliver v. Digital Equipment Corp.,
846 F.2d 103, 105 (1st Cir. 1988).

The United States Supreme Court has observed that Rule 56(c)
of the Federal Rules of Civil Procedure mandates an entry of
summary judgment against a party who fails to make a sufficient
showing to establish an element essential to that party's case,
and on which that party bears the burden of proof at trial.
Celotex, 477 U.S. at 322.  The test is whether or not, as to each
essential element, there is sufficient evidence favoring the

3

nonmoving party for a jury to return a verdict for that party.
DeNovellis, 124 F.3d at 306 (citing Anderson, 477 U.S. at 249-
50).

At the time this case was filed and the motion was made,
the local rules for this district required that with each motion
for summary judgment, the moving party serve and file both a
memorandum of law and "a concise statement of all material facts
as to which he contends there is no genuine issue necessary to be
litigated."[1]  District of Rhode Island Local Rule 12.  Rule 12.1
further required that "any party opposing such a motion shall
serve and file, together with the opposing memorandum of law
required under Local Rule 12, a concise statement of all material
facts as to which he contends there is a genuine issue necessary
to be litigated." Local Rule 12.1.  While Defendants submitted
both documents as the local rules required, Plaintiff, on the
other hand, although represented by counsel, submitted neither.

At this point, this Court must address Plaintiff's failure
to submit a statement of disputed material facts.  In such
circumstances, when making a determination on a motion for
summary judgment, the Court:

> [M]ay assume the facts as claimed by the moving
> party are admitted to exist without controversy

---

[1] Local Rule 12.1 (2) required the opposing party to file a
statement of facts.  As of January 1, 2006, the old rule was replaced
by Local Rule CV 56, which states that an objecting party "may file" a
Statement of Disputed and/or Undisputed Facts.

> except as and to the extent that such facts are
> controverted by affidavit filed in opposition
> to the motion, or by other evidentiary materials
> which the court may consider under Rule 56 of
> the Federal Rules of Civil Procedure.

D.R.L.R. 12.1(d).  The purpose of this rule is to prevent
district court judges from "being unfairly sandbagged by
unadvertised factual issues." Stepanischen v. Merchants Despatch
Transp. Corp., 722 F.2d 922, 931 (1st Cir. 1983).  In this case,
the complaint is broad and few facts have been asserted in
support of Plaintiff's vague claims.  Thus, the Court will rely
primarily on Defendants' Statement of Undisputed Facts in
determining whether there are any triable issues in this case.
Any parties who fail to observe local rules of the district in
which they practice do so at their own peril. Ruiz Rivera v.
Riley, 209 F.3d 24, 28 (1st Cir. 2000).

**II. Background Facts**

The facts are undisputed except where noted in this
decision.

Plaintiff is an African American woman who, at the time in
question, resided in Providence, Rhode Island. Paramount Hotel
Group, Inc. is the parent company of Paramount Management
Associates, LCC (collectively "Paramount"), and as of early 2000,
all employees working at the Susse Chalet in Warwick, Rhode
Island were actually employees of Paramount Management
Associates, LLC.  In 2001, Paramount "reflagged" the Susse Chalet

5

as a Fairfield Inn by Marriott.  It is clear that both Susse Chalet and Fairfield Inn by Marriott are brand names and not separate corporations.  Furthermore, regardless of the name being used by the hotel, all of the hotel employees, including Plaintiff, were employed by Paramount Management Associates, LLC.

In June 2000, Plaintiff completed an application to work as a housekeeper at the Susse Chalet in Warwick.  Dennis Bellucci, the executive housekeeper, hired Plaintiff the same day she filled out the application, despite his knowledge that Plaintiff had previously been convicted of a drug-related offense. Plaintiff's primary duty as a housekeeper was cleaning the guest rooms to which she was assigned.

Plaintiff was employed by Paramount for nearly two years. During that period she referred a number of her African American friends to the hotel for employment, and Bellucci hired all of them.  At some unspecified point in time over the course of her employment, Plaintiff received an employment evaluation wherein Bellucci praised her work and noted that he "rarely heard complaints from customers regarding [her] work." *Pl.'s Aff.* ¶ 7.

In December 2000, Bellucci issued Plaintiff a written warning for insubordination because she swore at him.  Plaintiff signed this "progressive counseling report," a document that bears the name and logo of Susse Chalet.  While the report itself notes that Plaintiff was to be suspended for two days, Plaintiff

6

maintains in her deposition that she was suspended with pay, per order of the district manager.  Plaintiff further testified that she believed that the reason for her suspension was her use of inappropriate language.

In April 2001, Plaintiff was issued a warning for failing to change a blood-stained pillow case in a room she was assigned to clean.  The employer's "Record of Disciplinary Discussion" notes that a guest brought the bloody pillow case down to the front desk, and showed it to the front desk clerk and general manager. Defendants' Statement of Undisputed Facts indicates that Plaintiff received a written warning and suspension for failing to change the pillow case.  In her deposition, however, Plaintiff maintains that she was not actually suspended.  Plaintiff contends that the hotel management was unable to provide her with either the pillow case or documentation of the customer complaint when she asked to see them.  However, she does not dispute the basic facts.  Nowhere in her deposition or affidavit does Ashley actually claim that she changed the bloody pillow case. Moreover, she never contested the resulting disciplinary action until after she was terminated.  At the time of the incident, Plaintiff signed the document acknowledging that she had been disciplined for failure to change the pillow case.  Plaintiff acknowledged at her deposition that she understood that the failure to change a blood-stained pillow case is a "health

7

violation." As Plaintiff does not dispute Paramount's claim that she failed to change that pillow case, the Court accepts this as an established fact in this case.

In April 2002, Carlos Cerda, the hotel's general manager, entered one of the rooms that Plaintiff had cleaned, so as to recover the personal effects left behind by a guest. According to Defendants' Statement of Undisputed Facts, when Cerda entered the room, he discovered that the sheets had not been changed. While he did not initiate any disciplinary action at this time, he did instruct Bellucci to monitor Plaintiff's work more closely.

Later that week, Bellucci "marked" the sheets in one of the rooms Plaintiff was assigned to clean. "Marking" the sheets is a procedure by which the supervisor enters a room that the housekeeper has not yet cleaned, and makes a mark on the sheets with a ball point pen. After a housekeeper finishes cleaning the room, the supervisor can check for the pen mark to see if the bed linens were changed. According to Bellucci, this procedure had been used in the past by hotel personnel to scrutinize the work of housekeepers, both Black and non-Black, and test whether they had been changing the bed linens.

In this case, after Plaintiff finished cleaning the room, Bellucci inspected the sheets, and found that the pen marking he had made was still on the sheet. At the end of her shift, Plaintiff was summoned to meet with Cerda and Bellucci, at which

8

point she was informed of what had transpired.  According to her affidavit, Plaintiff asked to see the sheets, but was told that they had been laundered.  She does not deny that she failed to change the sheets in her affidavit.  Plaintiff was issued another "Record of Disciplinary Discussion" form, bearing Paramount's name.  This time, Plaintiff refused to sign the form, and her employment was terminated.  It is agreed by the parties that failure to change bed linens is a terminable offense for a housekeeper.

In her affidavit, Plaintiff notes that after accusing Bellucci and Cerda of focusing their attention on her because she was Black, Cerda offered to rehire her, this time with Cerda as her direct supervisor.  It is not clear from the record where or when this conversation took place.

As support for her discrimination claim, Plaintiff offers the following instances of treatment she received while employed by Paramount:

In her affidavit, she notes that she was embarrassed and humiliated on three or four occasions when Bellucci called her "Aunt Jemima."[2]  In his affidavit, Bellucci denies ever making or hearing others make such comments, and adds that Plaintiff never complained to him about being called "Aunt Jemima."  *Bellucci*

---

[2]  Aunt Jemima is a popular brand of syrup and pancake mixes. Prior to redesigning its logo in 1989, the product's logo featured a picture of an African American woman wearing a head scarf.

9

*Aff.* ¶ 13.  Plaintiff also maintains that Bellucci told her that she resembled his friend John, who is African American. Plaintiff admitted in her deposition that she has never seen this friend John, and she was unable to articulate the significance of this comparison or why she assumed it constituted a racially derogatory remark.  *Def.'s Statement of Undisputed Facts* ¶ 23.

Plaintiff often wore a head scarf to work and claims that she was excluded from an April 1, 2002 staff meeting at which it was determined that head scarves were no longer permissible workplace attire.  *Pl.'s Aff.* ¶ 12.  Plaintiff adds that this meeting was mandatory, but that she did not get into trouble for her absence.  She further states that Cerda was unaware that such a meeting took place.  While Plaintiff does not offer any other details as to the motivation for this prohibition against wearing head scarves, Bellucci notes in his affidavit that the decision to ban head scarves was in response to an employee who wore a cut up T-shirt on her head.  In his deposition, Bellucci states that he offered to have Paramount buy the staff hats, but the staff declined the offer.

Plaintiff states in her Complaint that she was frequently sent home when there was no work to be done.  In her deposition, Ashley admits that she has no knowledge of whether non-Black employees were also sent home for lack of work.  Plaintiff also complains that Bellucci added hours onto her work day and

10

scheduled her to work on holidays that other non-Blacks did not have to work.  Plaintiff's deposition contains her admission that she was not privy to the way in which scheduling was done at the hotel.

Bellucci states in his affidavit that all the housekeepers were sent home for lack of work on occasion and that Plaintiff was not treated any differently than the other housekeepers on staff.  Bellucci also maintains that when there was extra work to be done, he treated Plaintiff the same as every other housekeeper on staff by asking her to help clean additional rooms.

At her deposition, Plaintiff testified that she believed Bellucci discriminated against her because he did not like her. When asked why she thought he didn't like her, she responded "I don't know."  Plaintiff also testified that she believed Cerda discriminated against her because he would only respond to Bellucci's version of the facts in the disputes between Bellucci and herself.  In her deposition, Plaintiff went on to allege that Rick Cerda, another member of the hotel's management, also discriminated against her by "going along with his brother [Carlos Cerda] and Dennis."

In her deposition, Plaintiff referenced the handling of an incident in 2001 involving a non-employee construction worker as evidence of this discrimination.  During construction on the hotel premises, Plaintiff claims that a non-employee, male

11

construction worker exposed himself to her while she was cleaning
a guestroom.   In the two days following the incident, Plaintiff
reported to work, but failed to mention the indecent exposure to
her supervisors.   It was not until three days after the incident
that one of Plaintiff's supervisors was finally informed of the
incident.

Once Bellucci and Rick Cerda were made aware of what had
transpired, they held a meeting at which Plaintiff and the
construction supervisor were present.  *Pl.'s Dep.* at 94.   Ashley
also then filed a police report.   At the meeting, Cerda and
Bellucci asked Plaintiff if she was telling the truth about what
happened, and in her deposition, Plaintiff states that she
threatened to quit her job unless something was done.   Cerda
informed Plaintiff that the construction worker had been removed
from the premises, and she never saw him again.   After the
incident, Plaintiff requested that a security guard be hired and
that she be assigned only to clean rooms on the first floor;
however, both requests were denied. Cerda gave Plaintiff two or
three days off from work in the days following the incident.

The following statistical data, provided by Defendants, is
undisputed: at the time Plaintiff was employed by Paramount, 12
(16.6%) of the approximately 72 employees working at the hotel
were African American or Black.   Sixteen (22.2%) employees were
Hispanic.   In 2002, there were seven (7) involuntary terminations

at the hotel at which Plaintiff worked.  Of those involuntarily terminated persons, two, including Ashley, were Black or African American, one was Hispanic, and four were White. *Def.'s Statement of Undisputed Facts* ¶ 35.  Defendants also claim that Paramount Management Associates, LLC maintains "stringent equal employment opportunity policies which provide for equal employment opportunities for all employees and applicants without regard to race, sex, religion, color, age, marital status, sexual orientation, national origin or disability." Id. ¶ 36.

On November 13, 2002, Ashley filed a "Charge of Discrimination" with the Rhode Island Commission for Human Rights ("Commission").  In that charge, Plaintiff named her employer as Fairfield Inn by Marriott, and notes that Carlos Cerda told her that the reason for her termination was "poor performance and customer complaints."  The Commission issued Plaintiff a Right to Sue Notice in September 2004; however, the Notice only names Fairfield Inn by Marriott as the employer.

## III. Jurisdiction and Procedural Posture

Plaintiff brought suit against Defendants in Rhode Island Superior Court on December 16, 2004.  As the State of New Jersey is the principal place of business and state of incorporation of both Paramount Defendants, and Plaintiff resides in the State of Rhode Island, this action was removed to this District Court by Defendants, pursuant to 28 U.S.C. §§ 1332 and 1441 (a) and (b).

This Court has jurisdiction over this Rhode Island FEPA claim, because the parties are citizens of different states and the amount in controversy exceeds $75,000.  Of course, this Court must apply Rhode Island law in deciding this controversy.

## IV. Failure to Exhaust Administrative Remedy

As a preliminary matter, Defendants claim that because Plaintiff filed a "Charge of Discrimination" with the Commission only against Fairfield Inn by Marriott, and because the Commission issued a Right to Sue Notice naming only Fairfield Inn by Marriott, Plaintiff has failed to exhaust her administrative remedies with respect to the Paramount Defendants.  This Court, however, does not agree with that contention.

As noted above, Paramount Hotel Group, Inc. is the parent company of Paramount Management Associates, LLC.  All employees of Susse Chalet and Fairfield Inn by Marriott in Warwick were employed by Paramount Management Associates, LLC.  Both Susse Chalet and Fairfield Inn by Marriott are simply brand names.

The filing requirements in both Title VII and the local FEPA analog serve the legitimate purposes of putting defendants on notice of the charges being brought against them and giving those defendants "an opportunity to participate in voluntary conciliation and avoid a subsequent lawsuit."  Russell v. Enter. Rent-A-Car Co. of Rhode Island, 160 F. Supp. 2d 239, 253 (D.R.I. 2001).  While the general rule is that FEPA claims, like those

14

under Title VII, may only be brought against the party that is named in the initial charge, there is an identity of interest exception that is relevant to this case.  <u>Id.</u> at 253-254.  Under this exception, a FEPA action may "proceed against a defendant who was not originally named in the administrative filing if there is a clear identity of interest between the named and unnamed defendants." <u>Russell</u>, 160 F. Supp. 2d at 254; <u>Johnson v. Palma</u>, 931 F.2d 203, 209 (2d Cir. 1991).

In order to make a determination as to whether there is an identity of interest between the Paramount Defendants and Fairfield Inn by Marriott, the Court must consider four relevant factors: 1) whether the role of the Paramount Defendants could be ascertained through reasonable effort by Plaintiff at the time Plaintiff filed the "Charge of Discrimination" with the Commission; 2) whether, given the circumstances, the interests of Fairfield Inn by Marriott are so similar to those of the Paramount Defendants that, for the purpose of obtaining voluntary conciliation and compliance, it would be necessary to include the Paramount Defendants in the Commission's proceedings; 3) whether the Paramount Defendants were prejudiced as a result of their absence from the Commission's proceedings; and 4) whether the Paramount Defendants in some way represented to Plaintiff that their relationship with Plaintiff was to be through Fairfield Inn by Marriott.  <u>See Johnson</u>, 931 F.2d at 209-10 (quoting <u>Glus v.</u>

15

G.C. Murphy Co., 562 F.2d 880, 888 (3d Cir. 1977)).  These guidelines will be considered in light of the facts presented in this case.

While Plaintiff might have been able to discern Paramount's role in the corporate structure had she done some investigatory research about her employer, the Court concludes that, under the circumstances, it was reasonable for her to name only Fairfield Inn by Marriott in her charge to the Commission.  She knew that she worked at the hotel bearing that name, even though she completed a Paramount W-4 form and received paychecks from Paramount.  She stated at her deposition:

> Defendants' Counsel: You were working for the same company the whole time, correct?
> Ms. Ashley: I guess.  I don't know.  I was working for Susse Chalet and it switched over to Fairfield Inn by Marriott. That's all I know.

*Pl.'s Dep. at* 165.  The highest level of education Plaintiff completed was the tenth grade, and it is unfair to hold her accountable for Paramount's complex corporate structure, especially since it had no bearing on her day-to-day work.  She began work at Susse Chalet, then worked at Fairfield Inn by Marriott when the hotel was renamed.  Her application for employment at Fairfield Inn by Marriott bore the Paramount logo, her paychecks were issued by Paramount, the disciplinary form issued to her in December 2000 bore the logo of Susse Chalet, and the subsequent disciplinary forms had "Paramount Hotel Group"

16

written on them.  This created a confusing situation for
Plaintiff, and thus it was reasonable for her to believe that she
was employed by an entity called Fairfield Inn by Marriott at the
time of her termination.

In considering the second and third guidelines set forth
above, this Court relies heavily on the same information about
Paramount's corporate structure that was previously examined.
Since the Paramount Defendants were using the Fairfield Inn by
Marriott brand name, they should have known that a complaint
against Fairfield Inn by Marriott, which is "not a standalone
corporation," was actually a claim against Paramount.  When Susse
Chalet was "reflagged" as Fairfield Inn by Marriott "[a]ll
employees continued to be employed by [Paramount]."  *Doloff Aff.*
¶ 2.  Consequently, Paramount should have known that any claims
by any of the employees of the hotel were really against it.

The scenario presented here is quite different from that at
issue in Johnson v. Palma, where the Second Circuit held that the
identity of interest exception did not apply.  931 F.2d at 210.
In Johnson, the Court determined that the local union and the
international union did not share similar interests such that it
would make it appropriate for the local union to represent the
international union in settlement negotiations without the
latter's participation.  Id. at 210.  Had the international union
been named on the charge, an administrative investigation might

17

have revealed that the international union had no role in the matters relating to the plaintiff's grievances.  Id.  In contrast, in the case before this Court, given the fact that all employees of Fairfield Inn by Marriott were actually employed by Paramount, it appears doubtful that a suit against Fairfield Inn by Marriott concerning the actions of its management team would not involve Paramount.  Furthermore, there is no evidence in the record of prejudice to Paramount resulting from the administrative proceedings.  Paramount does not claim that it failed to receive actual notice of the Commission proceedings.

The case before this Court also differs from Russell v. Enterprise Rent-A-Car Co. of Rhode Island, 160 F. Supp. 2d 239. In Russell, the plaintiff did not name Enterprise National in the administrative complaint.  She only named the local Enterprise franchisee for whom she worked.  Id. at 253.  Enterprise National claimed that it did not have notice of the claims being brought against it and that it was improper for the plaintiff to expand its civil action to include Enterprise National.  Id.  This Court noted in that case that, at the time of the administrative filing, the plaintiff knew of Enterprise National's role and the plaintiff could have easily named Enterprise National in the administrative complaint.  Id. at 254. In fact, the plaintiff even wrote a letter to Enterprise National's president explaining her complaints before she filed her administrative complaint.

18

Given these facts, this Court concluded that the identity of interest exception did not apply. Id. In contrast, Ashley's statements at her deposition demonstrate that she was not aware of the precise relationship between Paramount and Fairfield Inn by Marriott at the time she filed the "Charge of Discrimination."

The fourth guideline is inapplicable to this case because nothing in the record suggests that Paramount made any representation to Plaintiff as to who should be considered her employer.

Defendants rely heavily on an unpublished Order issued by this District Court in the matter of Valletta v. TSA Stores, Inc. d/b/a The Sports Authority, Inc. and Scott Chamberlain. C.A. No. 04-211-ML (D.R.I., Oct. 27, 2004). In that case, Judge Mary M. Lisi dismissed the plaintiff's FEPA claims against Defendant Chamberlain because he was not identified in the "Charge of Discrimination." Id. at 7. Chamberlain was the store manager of The Sports Authority in Warwick, Rhode Island, the company named in the charge. Given this arrangement, it was quite possible that The Sports Authority could be sued, but Chamberlain might not be involved in the matters giving rise to that suit. Such is not the case here, however, because Fairfield Inn by Marriott was the name being used by Paramount. Chamberlain was an employee of The Sports Authority and was named in the section of the charge form prepared by the Commission that delineates the grounds for

the plaintiff's discrimination claim, Id. at 3.   Therefore, plaintiff in that case should have formally named him if she wished to proceed against him.   Based on the facts presented in this record, this Court concludes that this case is distinguishable from Valletta, and that the ruling here on the identity of interest exception is not inconsistent with the ruling in Valletta.   Creating a confusing organizational structure cannot be allowed to act as a barrier shielding Defendants from charges brought against them.

## V. Discussion

At issue here is Defendants' motion for summary judgment on the Plaintiff's FEPA claim.   Under the FEPA, it is unlawful to discharge an employee or discriminate against him or her "with respect to hire, tenure, compensation, terms, conditions or privileges of employment, or any other matter directly or indirectly related to employment" because of his or her "race or color, religion, sex, sexual orientation, gender identity or expression, disability, age or country of origin."   R.I. Gen. Laws § 28-5-7.   FEPA is Rhode Island's analog to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq., and the Rhode Island Supreme Court has applied the analytical framework of Title VII actions to such cases. Russell, 160 F. Supp. 2d at 265; Eastridge v. Rhode Island College, 996 F. Supp. 161, 169 (D.R.I. 1998); Center for

Behavioral Health, Rhode Island, Inc. v. Barros, 710 A.2d 680,
685 (R.I. 1998).  In a Title VII action, when the plaintiff
cannot directly prove the employer's discrimination, the case is
traditionally analyzed according to the burden-shifting framework
articulated in McDonnell Douglas Corp. v. Green and its progeny.
411 U.S. 792, 802-05 (1973); Smith v. Stratus Computer, Inc., 40
F.3d 11, 15 (1st Cir. 1994); Gannon v. Narragansett Elec. Co.,
777 F. Supp. 167, 168 (D.R.I. 1991).

Under the McDonnell Douglas framework, the plaintiff bears
the initial burden of establishing a prima facie case of racial
discrimination. 411 U.S. at 802.  Given the fact-sensitive nature
of this inquiry, the precise "elements for a prima facie case
articulated in McDonnell Douglas are not the exclusive means by
which a plaintiff can establish the basics of a discrimination
claim." Eastridge, 996 F. Supp. at 167.  Quite the opposite, the
elements of the prima facie case that are listed in McDonnell
Douglas were "never intended to be rigid, mechanized, or
ritualistic." Id. (quoting Furnco Constr. Corp. v. Waters, 438
U.S. 567, 577 (1978)).  When it is approached with flexibility,
the framework helps in evaluating the evidence so as to determine
whether the plaintiff was being treated differently because of
her race and/or color.  If the plaintiff successfully meets the
initial burden of establishing the prima facie case of employment
discrimination, the burden then shifts to the employer "to

21

articulate some legitimate, nondiscriminatory reason" for the
employment decision that was adverse to plaintiff.  McDonnell
Douglas, 411 U.S. at 802. If the employer can meet its burden,
the plaintiff then must introduce evidence "sufficient for a
reasonable factfinder to infer that the employer's decision was
motivated by discriminatory animus" and not motivated by the
reason that the employer articulated.  Udo v. Tomes, 54 F.3d 9,
13 (1st Cir. 1995).

A. *Plaintiff's Prima Facie Case*

     In setting out her prima facie case, Plaintiff must show:
(1) she is a member of a protected class, (2) she was performing
satisfactorily so as to meet the employer's legitimate job-
performance expectations, (3) she suffered some adverse
employment action at the hands of her employer, and (4) she was
treated less favorably than someone outside her protected class.
McDonnell Douglas, 411 U.S. at 802; Byrd v. Ronayne, 61 F.3d
1026, 1031 (1st Cir. 1995); Udo, 54 F.3d at 12; Smith, 40 F.3d at
15; Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1316
(11th Cir. 2003); see Gannon, 777 F.Supp. at 168.

     In assessing Plaintiff's prima facie case, the Court accepts
that Plaintiff is a member of a protected class.  However, the
second element of the prima facie case presents a significant
hurdle because Ashley's record of disciplinary infractions
indicate that she had serious performance issues during the

22

course of her employment at both Susse Chalet and Fairfield Inn
by Marriott.   There are three documented occasions in the record
in which Plaintiff was admonished for not acting in compliance
with company policies.   Plaintiff admits to her use of
inappropriate language in the workplace that was the subject of
the December 2000 disciplinary action.   The second episode
involved the blood-stained pillow case that was the subject of
the April 2001 "Record of Disciplinary Discussion."   Plaintiff
falls far short of unambiguously denying that allegation.   *Pl.'s
Aff.* ¶ 14.   Moreover, Plaintiff signed both the December 2000 and
April 2001 documentation, acknowledging each of those warnings.
As Plaintiff does not dispute Defendants' charges of her poor job
performance, these disciplinary actions must be accepted as
proven facts.   With regard to the April 2002 sheet-marking
incident that ultimately resulted in Plaintiff's termination,
Ashley states in her affidavit that when she asked to see the
sheets, she was told that they had been laundered.   The confusion
surrounding this issue centers on the fact that Plaintiff has not
clearly denied the allegations brought by Bellucci and Paramount.
Although Plaintiff refused to sign the disciplinary report about
this matter, she never flatly denied the charge that she failed
to change the sheets in question. Based on this testimony and the
evidence set forth by Plaintiff in her own affidavit, the issues
of fact in dispute here do not raise to the level of materiality.

23

In other words, Plaintiff does not present sufficient evidence
for a jury to conclude that the entire incident was fabricated so
as to harass and discriminate against her.

As evidence that she was performing satisfactorily,
Plaintiff explains in her affidavit that she received an
employment evaluation in which Bellucci "praised [her] work and
noted that he rarely heard complaints from customers" about her
work.  Plaintiff fails to inform the Court as to when this
evaluation was issued, but it is obvious that it pre-dated the
disciplinary warnings she received.  Although evidence such as
"increased responsibilities over time, positive feedback and pay
increases" need not extend right up until the moment she was
fired, Smith, 40 F.3d at 15, it is vital for Plaintiff to point
out when this "praise" was offered in order to support her claim
that she was performing her housekeeping duties satisfactorily.
It is clear that at the time Plaintiff was terminated she had
failed, at least two times, to change the bed linens between
guest occupancy.  These are serious derelictions of duty for a
housekeeper at any hotel and clearly grounds for dismissal.

In Center for Behavioral Health, Rhode Island, Inc. v.
Barros, the plaintiff received positive written evaluations for
two consecutive years in 1989 and 1990, took on greater
responsibilities, and received a small pay increase. 710 A.2d at
682.  The plaintiff's supervisor noted that in late 1990,

24

however, the plaintiff became unresponsive, was repeatedly tardy, and failed to perform her assigned tasks. <u>Id.</u> at 683. Unlike the case before this Court, the plaintiff's supervisors in <u>Barros</u> never issued her any written reprimands. <u>Id.</u> Moreover, the plaintiff in <u>Barros</u> was terminated just two months after announcing her pregnancy, which triggered her status as a member of a protected class. <u>Id.</u> As a result of this evidence, the Court in <u>Barros</u> found that the plaintiff sufficiently made out her prima facie case.

The facts in this case are quite different. As evidence of her satisfactory performance, Plaintiff offers one undated positive evaluation. There are also three documented incidents of misbehavior on Plaintiff's part, two of which she acknowledged. Furthermore, unlike <u>Barros</u>, from the moment she was hired, Ashley was a member of a protected class. She was a member of a protected class when she received her positive evaluation, as well as when she received the documented reprimands.

To satisfy the third element of a prima facie case, Plaintiff needs to show that there was an adverse employment action in order to state a claim of employment discrimination. <u>Smith</u>, 40 F.3d at 15; <u>Rossi v. Amica Mutual Insurance Co.</u>, _____ F. Supp. 2d _____ ,2005 WL 309975, at *5 (D.R.I. Feb. 9, 2005). It is interesting to note that Plaintiff's complaint does

25

not directly cite her termination as a manifestation, or even example, of the discrimination she suffered, but her "Charge of Discrimination" does.  Plaintiff also references having to work holidays and extra hours and being sent home from work when business was slow as further support for her claim of discrimination, but she freely admits her ignorance as to how scheduling was done at the hotel and does not refute Bellucci's claim that Plaintiff was treated the same as any other housekeeper in this regard.  In any event, it is clear that Plaintiff was terminated, and thus, that is adverse employment action.

Finally, with regard to the final element of the prima facie case, Plaintiff presents no evidence that Black and non-Black workers were treated differently.  As noted above, Plaintiff argues that hours were added onto her work days, that she was often sent home early for lack of work, and that she had to work holidays that non-Blacks did not.  *Def.'s Statement of Undisputed Facts* ¶ 32.  However, Plaintiff admits that she is ignorant as to how scheduling is done at the hotel and that she does not know whether other non-Blacks were sent home for lack of work.  For their part, Defendants offer Bellucci's testimony, uncontroverted by Plaintiff, which maintains that the hotel added and reduced the hours of all the housekeepers as needed and in a non-discriminatory manner.  In light of this uncontradicted

testimony, Plaintiff's allegations cannot carry the day.

At her deposition, Plaintiff charged that in response to the 2001 incident in which a non-employee male construction worker exposed himself to her, Defendants did not take any action. *Pl.'s Dep.* at 92. The factual record, however, proves otherwise. After the incident, a meeting was held with several people including the construction worker's supervisor, Ashley and Defendants' agents, and Ashley was asked about the validity of her version of what had happened. Once Plaintiff's supervisors were made aware of the incident, she was given time off from work. The offending construction worker was escorted off the premises and Plaintiff never saw him again; however, her requests to be placed on the first floor or have a security guard be hired were both denied. This whole incident is a "red herring." It does not even raise an inference that either race or color was an issue in that matter. The mere fact that Plaintiff was asked to validate her story does not, on its face, evidence discriminatory animus.

Plaintiff also references an alleged mandatory meeting, of which she was not aware, where it was determined that head scarves, like the one Plaintiff wore, were banned. Plaintiff does not present any evidence, other than her allegation, that this meeting took place and that a vote was taken to ban head scarves. As has been made clear repeatedly, "[t]he evidence

27

illustrating the factual controversy cannot be conjectural or problematic," and this evidence is just that.  <u>Mack v. Great Atlantic & Pacific Tea, Co.</u>, 871 F.2d 179, 181 (1st Cir. 1989). Perhaps even more problematic for Plaintiff is the fact that it is not clear what this meeting is supposed to demonstrate. As the Court cannot invent evidence of discrimination from unexplained incidents that are not on their face discriminatory, this meeting is deemed irrelevant and non-material to the issue at hand.

This Court recognizes that the Plaintiff's burden in setting out her prima facie case is "not onerous."  <u>Smith</u>, 40 F.3d at 15 (quoting <u>Mesnick v. General Elec. Co.</u>, 950 F.2d 816, 823 (1st Cir. 1991)).  However, she has made no showing that her work was satisfactory at the time she was terminated, in the face of undisputed evidence that she committed serious violations of hotel policy.  Therefore, she has failed to make out a prima facie case. On this basis alone, the Court must grant Defendants' motion for summary judgment.  However, to button up this case, the Court will assume that Plaintiff has made out a prima facie case, and proceed to consider the pretext issue.

B. *Defendant's Burden*

When a plaintiff has set out a prima facie case of employment discrimination, "[t]he next burden - articulating a legitimate, nondiscriminatory reason for the adverse employment decision - belongs to the defendant."  <u>Mesnick</u>, 950 F.2d at 823.

28

Defendants must clearly set forth the nondiscriminatory reasons for firing Ashley.  <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981).

Defendants have documented three incidents during which Plaintiff violated company protocol, and Plaintiff signed the documentation related to the first two.  The first incident involved using profanity during the course of her employment, and the second and third involved the failure to change bed linens in hotel guestrooms.  It is undisputed that the failure to change bed linens is a serious violation of hotel policy, and thus, a terminable offense.

At the summary judgment phase of a case, Defendants need not convince the Court that they were actually motivated by the reasons set forth, because the ultimate burden of persuasion remains, at all times, with Plaintiff.  <u>Burdine</u>, 450 U.S. at 253; <u>Udo</u>, 54 F.3d at 12.  Defendants have successfully met their burden under the <u>McDonnell Douglas</u> paradigm, and "[w]hether 'ultimately persuasive or not'", the evidence provided is sufficient to satisfy what the framework demands.  <u>Byrd</u>, 61 F.3d at 1031, (quoting <u>St. Mary's Honor Ctr. v. Hicks</u>, 509 U.S. 502, 509 (1993)).

*C. Plaintiff's Burden: Pretext and Discriminatory Animus*

With Defendants having met their burden, the burden then shifts back to Plaintiff, who now "must have the opportunity to

29

demonstrate that the [Defendants'] proffered reason was not the true reason for the employment decision." Burdine, 450 U.S. at 256.  In order to survive a summary judgment motion, Plaintiff's evidence must allow a jury to find that Paramount's reason for terminating Ashley's employment "[was] in fact a coverup for a racially discriminatory decision." McDonnell Douglas Corp., 411 U.S. at 805; Udo, 54 F.3d at 13. Put more simply, at the summary judgment stage, Plaintiff "must produce evidence to create a genuine issue of fact with respect to two points: whether the employer's articulated reason for its adverse action was a pretext and whether the real reason" was race discrimination. Quinones v. Buick, 436 F.3d 284, 290 (1st Cir. 2006), (quoting Thomas v. Eastman Kodak Co., 183 F.3d 38, 62 (1st Cir. 1999)).

"Especially relevant" to a showing of pretext would be evidence of disparate treatment of Blacks.  McDonnell Douglas Corp., 411 U.S. at 804.  For example, if Plaintiff could put forth evidence to back up her assertion that Blacks were made to work holidays that non-Blacks did not work, as well as evidence that non-Blacks were not sent home early for lack of work or saddled with extra hours as Blacks were, or that the "marking" procedure used on the bed linens in one of Plaintiff's assigned rooms was not utilized to test the work of non-Black housekeepers, she might have a case.  However, she presents no such evidence, and in fact, it is undisputed that the "marking"

30

procedure was used in the past relating to non-Black employees so as to determine if they were changing the bed linens. *Def.'s Statement of Undisputed Facts* ¶ 17. Furthermore, Plaintiff cannot support her claims about discrimination in regards to scheduling because she offers no information or data about hotel scheduling procedures. Plaintiff has also admitted that she does not know whether non-Black employees were sent home for lack of work, and she has not refuted Bellucci's claim that Plaintiff was treated "the same as every other housekeeper in this respect." *Bellucci Aff*. ¶ 15. It is axiomatic that "mere conclusory suspicion is no substitute for specific evidence that discrimination was involved." Quinones, 436 F.3d at 290. Rather than present hard evidence of racial discrimination, Plaintiff's affidavit and deposition reflects her "subjective speculation and suspicion," that her termination was due to discriminatory animus rather than her inability to adequately perform her duties. See id. Plaintiff's "unsupported characterizations" are insufficient to create a triable issue of fact. Id. at 291.

The United States Supreme Court has further instructed that "other evidence that may be relevant to any showing of pretext includes facts as to the ... [defendant's] general policy and practice with respect to minority employment." McDonnell Douglas Corp., 411 U.S. at 804-05. It is undisputed that at the time Plaintiff was employed, 12 (16.6%) of the approximately 72

employees working at her hotel were African American or Black, and sixteen (22.2%) employees were Hispanic. Of the seven involuntary terminations that took place in 2002 at the hotel at which Plaintiff worked, four of those persons terminated were white, while only two (one of which was Ashley) were Black, and one was Hispanic. These statistics completely undermine Plaintiff's pretext claim.

It should be noted here that Plaintiff did not actually present, in the form of a written memorandum of law in opposition to Defendant's motion for summary judgment, an argument addressing the issue of pretext. Instead, this Court was left to piece together arguments from Plaintiff's affidavit and Complaint, as well as the segments of her deposition that were entered into the record by Defendants. In Quinones v. Buick, the First Circuit affirmed the District Court's finding that the plaintiff's opposition memorandum was "woefully deficient." 436 F.3d at 290. While in this case, Ashley's opposition memorandum is "woefully" absent, the fact remains that "it is not the court's responsibility - let alone within its power - to cull the entire discovery record looking for facts which might convert such a bald assertion [of discrimination] into a triable issue." Id. (alteration in original).

With regard to Plaintiff's allegations that she was the target of racially derogatory remarks, Plaintiff's affidavit

32

maintains that Bellucci told her that she resembled his friend John, a Black man.   Furthermore, she argues that Bellucci embarrassed and humiliated her by calling her Aunt Jemima in front of customers and coworkers on three or four occasions. *Pl.'s Aff.* ¶¶ 9-11.   Bellucci disputes this latter claim.   While the issues of whether these comments were made and the meaning and offensiveness of such comments are appropriately questions for a jury, whether these remarks constitute an issue of material fact is a question for this Court to decide.

Although "discriminatory comments may be probative of pretext if a plaintiff 'can show that discriminatory comments were made by the key decisionmaker or those in a position to influence the decisionmaker,'" the First Circuit has also held that "stray remarks" might not permit the inference that the employer's motivation was discriminatory when there is a "compelling stated reason for [p]laintiff's termination." Ramírez Rodríguez v. Boehringer Ingelheim Pharms., Inc., 425 F.3d 67, 79-80 (1st Cir. 2005).   Taking the facts in the light most favorable to Plaintiff, and assuming that Bellucci made those comments, the extent to which the comments are probative of pretext is "circumscribed if they were made in a situation temporally remote from the date of the employment decision, or ... were not related to the employment decision in question." Straughn v. Delta Air Lines, Inc., 250 F.3d 23, 36 (1st Cir.

2001), (quoting <u>McMillan v. Massachusetts SPCA</u>, 140 F.3d 288, 301 (1st Cir. 1998)). There is no evidence in the record as to when these comments were made, and the "Aunt Jemima" comment was only made between three and four times during the course of her employment. *Def.'s Statement of Undisputed Facts* ¶ 23. The comment by Bellucci that Plaintiff resembles his friend John, is another "red herring" in this case. There is nothing to support an inference that this remark was in some way discriminatory, particularly because Plaintiff, herself, has neither seen this man nor articulated a reason as to why this remark was discriminatory. <u>Id.</u> In addition, the Aunt Jemima remarks have not been shown to have any bearing on her termination. In any event, the Court need not get burdened in a quagmire of characterization because there is simply not enough in the record to make the comments "significantly probative of pretext absent some discernible indication that [their] communicative content, if any, materially erodes the stated rationale for the challenged employment action." <u>Straughn</u>, 250 F.3d at 36.

Other considerations are relevant here as well. First among them is Plaintiff's own admission that the failure to change bed linens is a terminable offense. She failed, at least twice, to change bed linens, and that completely justifies her termination. These "enumerated job deficiencies," as well as the glaring fact that the man Plaintiff accuses of discriminating against her is

34

also the man who hired her roughly two years before, "makes any inference of discriminatory animus unwarranted." Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991). It "hardly makes sense to hire workers from a group one dislikes...only to fire them once they are on the job." Proud, 945 F.2d at 797 (quoting Peter J. Donohue, III & Peter Siegelman, The Changing Nature of Employment Discrimination Litigation, 43 Stan. L. Rev. 983, 1017 (1991)).

Given the vagueness of the allegedly discriminatory comments, as well as the fact that there is no indication in the record that Ashley ever complained about such comments, these comments, even when considered in a light most favorable to Plaintiff, do not raise material issues of fact.

The First Circuit has unambiguously held that when a "case arises on the employer's motion for summary judgment, the plaintiff's task is to identify a genuine issue of material fact with respect to whether the employer's stated reason for the adverse employment action was a pretext for a proscribed type of discrimination." Rathbun v. Autozone, Inc., 361 F.3d 62, 72 (1st Cir. 2004). The Court concludes that Plaintiff has failed to meet that burden here. That is the bottom line in this case.

## VI. Conclusion

For the reasons articulated herein, Defendants' motion for summary judgment on Plaintiff's single count state FEPA Complaint hereby is granted. The clerk shall enter judgment for Defendants

35

on Plaintiff's Complaint, forthwith.

It is so ordered.


Ronald R. Lagueux
Senior United States District Judge
September /9 , 2006

36